UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CASE NO.: 3:17-CR-197-J-32JBT |
| ) | |
| -VS- ) | |
| ) | |
| JOHN ROBERT HORNER ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____/ | |

**SENTENCING MEMORANDUM ON BEHALF
OF THE DEFENDANT, JOHN R. HORNER**

Through the undersigned counsel, the Defendant, **JOHN ROBERT HORNER** (hereinafter "Defendant" or "Mr. Horner"), files the following Sentencing Memorandum setting forth all factors that the Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

**I.    INTRODUCTION**

On October 11, 2017, a grand jury returned a one-count indictment against the Defendant, John Robert Horner, for violating 18 U.S.C. §§ 922(g)(1) and 924(e) for knowingly possessing a firearm after previously being convicted of a felony. Mr. Horner faces a minimum mandatory sentence of fifteen years, and maximum sentence of life. The minimum mandatory sentence stems from Mr. Horner's classification as an Armed Career Criminal, pursuant to USSG §4B1.4.

On June 13, 2018, Mr. Horner pleaded guilty to the sole count in the indictment, pursuant to a plea agreement. The plea agreement contains a "cooperation" provision, allowing for the Government to recommend a downward departure based on the Defendant's substantial assistance in the investigation or prosecution of other persons who have committed offenses, pursuant to USSG §5K1.1 and/or 18 U.S.C. § 3553)(e). On September 12, 2018, the Government filed such a motion, recommending a two-level departure. The motion also allows for the Court to consider a sentence under the minimum mandatory sentence of fifteen years. As a result of his designation as an armed career criminal, Mr. Horner's faces a minimum mandatory sentence of fifteen years, and a guideline sentencing range of 180 to 210 months (Offense Level 30).

1

## II. BACKGROUND OF THE DEFENDANT

As his record reflects, Mr. Horner has lived an extremely difficult life, with the majority of his life-choices being heavily influenced by his chronic use and abuse of illegal substances. Despite his history, Mr. Horner is determined to make a better future for himself, as this memorandum hopes to illustrate.

### A. Mr. Horner's Background

Mr. Horner was born on September 13, 1988, in Jacksonville, Florida, into an intact family. At the age of four, however, Mr. Horner's parents divorced, setting off a series of events that would ultimately, and negatively, shape his future. Mr. Horner was close with his father and spent the first two years living with him following his parents' divorce, however, his father passed from medical complications when the Defendant was only nine years old. The Defendant's father was perhaps the last, and only, positive influence in his life.

Life with his father was positive. He felt encouragement and stability and experienced an environment in which he could thrive. Life with his mother, however, was the complete opposite. Mr. Horner's mother suffered from schizophrenia and abused alcohol. To complicate matters more, Mr. Horner's mother remarried to an individual that was physically abusive to both him and his mother. Mr. Horner even suffered sexual abuse at the hands of a relative of his stepfather from the ages of six to eight. It was during this critical time in his life, that Mr. Horner's father passed away. The one individual that he sought comfort in, and could rely on, was no longer there.

The effect of his father's passing, and the homelife he was being forced to live in, began to take an emotional and mental toll on Mr. Horner. He began to develop anger and mental health problems (diagnosed with anti-social personality disorder) and defiant behavioral patterns. Unable to effectively parent, mainly due to her own limitations and struggles, the Defendant's mother sent Mr. Horner off to live with extended family for a year. In short, rather than provide a stable and encouraging homelife to a young child in need, his mother decided to move him away.

After spending approximately one year with relatives, Mr. Horner returned home to essentially the same situation he was in prior to his departure; more abuse and neglect. At the age of thirteen, Mr. Horner had had enough and left home, ultimately living in the woods for a period of six months, while at the same time still attempting to attend school. Mr. Horner found himself in trouble often, many times facing juvenile court charges relating to theft and property crimes. His behavior had deteriorated, and school personnel began to notice. Specifically, his teachers

noted that he had difficult staying on task, trouble completing assignments, engaged in self-injurious behavior, suffered from anxiety, impulse and anger control, and aggression. Teachers even noted that Mr. Horner had low self-esteem and suffered significant sadness as a result of his father's passing. Mr. Horner was baker acted several times as a result of his health conditions and was further diagnosed with depression. He was only thirteen years of age when these conditions were noted.

Mr. Horner survived an abusive childhood, complicated with significant mental health problems. Survived, however, is merely a word that denotes that he lived through it. The reality is that Mr. Horner's life was forever impacted by that time period. The emotional and physical scars he received are things that shaped his decision-making process and life choices for decades. Mr. Horner began drinking alcohol and using marijuana as young as fifteen or sixteen years of age. Those gateway substances eventually evolved into harder substances, such as opiates, heroin, Xanax, and fentanyl. Those substances became both an escape from, and the source of, many of his problems. Without sufficient education or family support, the habit of substance abuse became his way of life and focus of his daily activities. With little money, the quest for the next fix often resulted in the completion of criminal acts. Drug related charges led to license suspensions, which in turn led to arrests for driving without a license. The need for funds to secure drugs led to burglaries to cars; looking for items to pawn for cash. Being in the drug life eventually led to attempts to sell narcotics for cash; including an arrest in 2012 for sale of a controlled substance. A review of the Defendant's criminal history paints the exact picture illustrated above.

Despite his hardships, despite his time in and out of facilities, and despite his lack of family support, Mr. Horner has found something in his life worth fighting for. Specifically, in February of 2018 became a father when his son Nickolye was born. The birth of his son has changed Mr. Horner's perspective on this world and has changed his thought process. He now realizes that his decisions will (and have already) affected other people, not just himself. His focus is squarely on resolving this case, paying his debt to society, and finding a way to contribute positively to the life of his son.

### B. The Offense

Mr. Horner is charged, as outlined above, with violating 18 U.S.C. §§ 922(g)(1) and 924(e) for knowingly possessing a firearm after previously being convicted of a felony. The charges stem from a police investigation into a possible stolen vehicle in July of 2017. Specifically, the Jacksonville Sheriff's Office responded to a report of vehicle theft, where the owner stated that

two individuals who were working on a van nearby (in the roadway) may have been involved. JSO subsequently made contact with the owner of that van, who was the Defendant, Mr. Horner. Mr. Horner informed police that while seeking out someone to help him repair his own vehicle, he encountered an individual named Aaron Miller driving the vehicle that had been reported as stolen. Mr. Horner informed that Mr. Miller was acting crazy and suspicious, and rummaging through the vehicle. Mr. Horner stated that he noticed a pistol in the center console and moved it away from Miller as a result of his eccentric behavior. Mr. Horner reported that Mr. Miller eventually ran off, leaving the vehicle behind, at which point Mr. Horner drove the car to a safe location and hid the firearm he had spotted. Mr. Horner denied stealing the vehicle or knowing that it was stolen. Mr. Horner cooperated with police, and volunteered this information about the firearm, even leading officers to its location. Without his input and subsequent cooperation with police, his instant charge would not have occurred.

Because Mr. Horner is a convicted felon, his possession of the weapon led to the instant charges. Despite his many arrests for drug possession and driving offenses, his armed career designation is being applied due to one particular case. Specifically, in 2013, Mr. Horner was charged (in one case number) with three counts of sale of a controlled substance, each resulting in a conviction. Even though the charges were under one case number, each count was the result of a separate drug transaction (on different days).

### C. Mr. Horner's Future

Mr. Horner wants nothing more than to put his past where it belongs; in the past. The birth of his son has had a profound impact on his life, causing him to reevaluate his past choices and reconsider his future. Mr. Horner knows that while he now has a newfound motivation in life, the path towards a better lifestyle is not one that is going to be easy. Due to his incarceration, and the incarceration of the child's mother, Mr. Horner's son will need to be cared for by other individuals. Mr. Horner has been advised that Nickolye will be adopted, most likely by a family friend who has promised to allow Mr. Horner to remain in his son's life. Mr. Horner knows it will take time, counseling, and support to get back to his son. Mr. Horner now seeks nothing more than an opportunity to be a part of his child's life; to provide that positive father-son relationship that he once enjoyed.

## III. SENTENCING UNDER *BOOKER*

On January 12, 2005, the United States Supreme Court handed down its decision in United States v. Booker, 543 U.S. 220 (2005). The Court held that the United States Sentencing Guidelines ("USSG") violated defendants' rights in two distinct ways. First, a defendant's Sixth Amendment right is violated because the USSG requires judges, not juries, to decide facts that expose defendants to specific maximum sentences. Id. at 244. Second, the USSG violated a defendant's Fifth Amendment right by allowing judges to find those enhancing facts by a preponderance of the evidence, and not beyond a reasonable doubt. Id. Based on this analysis, the Court found those provisions of the Federal Sentencing Reform Act of 1984 that make the USSG mandatory, or which rely on the USSG's mandatory nature, incompatible with its Sixth Amendment holding. Id. at 245. Consequently, those provisions were severed and excised by the Court, effectively making the USSG advisory. Id.

Instead of being bound by the USSG, the Sentencing Reform Act, as revised by Booker, "…requires a sentencing court to consider Guidelines ranges … but it permits the court to tailor the sentence in light of other statutory concerns as well." Id. Therefore, in accordance with Booker, sentencing courts *must* treat the guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a). Since the decision in Booker and its progeny, there has been a debate among the courts as to how much weight should be given to the USSG as one of the factors a court must consider. For the Eleventh Circuit, this debate was settled by the decision in Hunt v. United States, 459 F.3d 1180 (11th Cir. 2006). The court in Hunt rejected "any across-the-board prescription regarding the appropriate deference to give the guidelines." Id. at 1184. Rather, a "district court may determine, on a case-by-case basis, the weight to give the Guidelines, so long as that determination is made with reference to the remaining section 3553(a) factors that the court must also consider in calculating the defendant's sentence." Id. at 1185. Thus, as recognized by Judge Tjoflat in United States v Glover, in some cases the Guidelines may have little persuasive force in light of some of the other section 3553(a) factors. United States v Glover, 431 F.3d 744, 752-753 (11th Cir. 2005).

The primary directive in section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

*(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;*

5

*(B) to afford adequate deterrence to criminal conduct;*

*(C) to protect the public from further crimes of the defendant; and*

*(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.*

In determining the minimally sufficient sentence, section 3553(a) further directs the courts to consider these additional factors:

*(1) "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1));*

*(2) "the kinds of sentences available" (§ 3553(a)(3));*

*(3) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" (§ 3553(a)(6)); and*

*(4) "the need to provide restitution to any victims of the offense" (§ 3553(a)(7)).*

Additionally, other statutory sections also provide guidance for the district courts in determining the appropriate sentence. Specifically, 18 U.S.C. § 3582(a) instructs a district court that when imposing a term of imprisonment after considering the factors set forth in section 3553(a), the court must recognize that "imprisonment is *not* an appropriate means of promoting correction and rehabilitation." (emphasis added).

## IV. 3553 FACTORS and OTHER SENTENCING CONSIDERATIONS

Mr. Horner does not dispute the seriousness of his offense. In fact, he is keenly aware of why strict laws are in place to prevent felons from possessing firearms. He does dispute, however, that just punishment for this offense is going to be achieved by imposing a sentence of fifteen years or more as required by the armed career enhancement, or a sentence within the proposed guideline range. The arguments for a sentence below the minimum mandatory, and below the proposed guideline range are outlined below, and start with an analysis of the armed career enhancement.

The Armed Career Criminal Act (hereinafter "ACCA") was designed to allow enhanced penalties and punishment for the worst repeat offenders. While Mr. Horner does not deny that he fits the technical definition of an armed career offender for purposes of such an enhancement, he would submit that his criminal history does not support the purpose or intent behind the ACCA. Specifically, Mr. Horner's qualifying offenses are three charges related to the sale of a controlled

6

substance he made to an undercover officer in the span of approximately 45 days.[1] These charges, although technically three "separate offenses", were all charged in one charging document, in one case number. In short, a period of a month-and-a-half that took place almost seven years ago, is now controlling the narrative and substantive analysis of Mr. Horner's sentencing. This is hardly the type of defendant the ACCA was designed to target and enhance.

Mr. Horner would also point out that despite the number of offenses in his criminal history, the majority of those offenses are related to possessing controlled substances or driving related offenses. The United States Sentencing Guidelines allows for a court during sentencing to allow for a downward departure if "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes..." See Federal Sentencing Guidelines Manual § 4A1.3 (2018). Mr. Horner concedes that the Federal Sentencing Guidelines prohibit such a departure under this theory as the guidelines specifically prohibit a departure on these grounds if the defendant has been classified as an armed career criminal, however, Mr. Horner points this out for the sole purpose of demonstrating how the broad net of the ACCA has not only captured perhaps an unintended target, exposing him to a fifteen year minimum mandatory, but also eliminating other arguments for leniency that would otherwise be entirely relevant for the Court's consideration during sentencing.

Despite the concerns regarding the application of the ACCA to the Defendant's case as outlined above, there are some very specific provisions of the Federal Sentencing Guidelines that directly and squarely apply to Mr. Horner's case. First, the Federal Sentencing Guidelines provide for a downward departure in scenarios where a defendant voluntarily discloses to authorities the existence of an offense prior to its discovery. Specifically, § 5K2.16, Federal Sentencing Guidelines states:

*"If the defendant voluntarily discloses to authorities the existence of, and accepts responsibility for, the offense prior to the discovery of such offense, and if such offense was unlikely to have been discovered otherwise, a downward departure may be warranted."*

The exact scenario contemplated by § 5K2.16 is found here. In the instant case, Mr. Horner was approached by JSO officers who were investigating the theft of a motor vehicle (not a firearm).

---

[1] Defendant was charged with three counts of sale of a controlled substance in case number 16-2012-CF-011406-AXXX-MA (Duval County, State of Florida). The case contains one charging document, with three separate counts, alleging sales on October 3 and 12, and November 19 of 2012.

7

Mr. Horner, volunteered that he had been in the suspected vehicle, but provided an explanation as to why; an explanation that did not include any element of theft or criminal activity. Mr. Horner, on his own, also volunteered that he had removed a firearm and hid it in a location so as to render it safe (away from the hands Mr. Miller). He cooperated with law enforcement, accepted responsibility for possessing the weapon, and voluntarily led law enforcement to the weapons location. Possession of the firearm is the sole offense with which Mr. Horner has been charged. The discovery of the weapon, and his verbal statements connecting him to it, would not have been discovered but for his voluntary admissions and cooperation. Accordingly, his actions serve as a basis for a departure from the guidelines.

Additionally, Mr. Horner would submit that he is entitled to both a sentence below the minimum mandatory of fifteen years, as well as a departure from the guideline range pursuant to § 5K1.1. Federal Sentencing Guidelines. Specifically, Mr. Horner has accepted responsibility for his actions and choices and has cooperated with the Government by providing substantial assistance in the investigation and prosecution of other individuals. In recognition of his efforts and assistance, the Government filed a motion with this court recommending that Mr. Horner be given a two-level departure.

As Mr. Horner's cooperative efforts are ongoing, the nature and scope of his cooperation will be discussed in further detail at sentencing, however, Mr. Horner would submit that not only has his cooperation allowed the Government to investigate and prosecute other individuals, the cooperation has been tendered at a significant risk to Mr. Horner personally. Specifically, Mr. Horner has received threats on his life, and the lives of family members, as a result on his cooperation. Despite his high level of concern, he continued to cooperate because he believed it to be the best possible way to earn a path back to his family, and to start the process of creating a better life by making the correct and moral decisions that are required of every good citizen. He felt obligated to cooperate, because quite simply, it was the right thing to do. Mr. Horner would submit that the nature and extent of his cooperation not only warrant a sentence under the minimum mandatory, but a sentence well below the guideline range.

Lastly, Mr. Horner would submit that his personal history and characteristics warrant a variance from the guideline range in a downward direction. As outlined above, Mr. Horner has had to struggle both internally and externally for the majority of his life. From a young age he has had to deal with the loss of his father (the only supportive influence in his life), the physical and sexual abuse of family members, various mental health conditions, substance abuse struggles, and

the birth of a son that he cannot be physically there for. His choices have been profoundly shaped by his mental health issues and drug addiction. This is an individual that would benefit greatly from stability, routine, and therapy and counseling. Prolonged incarceration will do nothing to benefit Mr. Horner in the long term and would not enhance any of the directives or considerations of the Court as outlined in Section 3553.

## V.   SENTENCING RECOMMENDATION AND CONCLUSION

In light of the Booker decision, and taking into account the section 3553(a) factors and the arguments outlined above, Mr. Horner asks this Honorable Court to impose a sentence of no more than five years of incarceration. Such a sentence would provide just punishment, as well as an adequate deterrence for a man attempting to turn his life around. Such a sentence would be sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Respectfully submitted, this ____22____ th day of ____June____, 2019.

**ARNOLD LAW FIRM**

BY: _____
John P. Leombruno, Esq.
Fl. Bar # 0851361
Attorney for Defendant
6279 Dupont Station Ct.
Jacksonville, FL 32217
(904) 731-3800 (main)
(904) 731-3807 (facsimile)
jleombruno@arnoldlawfirmllc.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on ____June 22____, 2019 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: AUSA Laura Taylor, Esq.

BY: _____
John P. Leombruno, Esq.
Fl. Bar # 0851361
Attorney for Defendant

9